Case number 24-1104 et al. Compañía Cervecera de Puerto Rico, Inc. petitioner versus National Labor Relations Board. Ms. Moreno for the petitioner, Ms. Sheehy for the respondents. Good morning. May it please the court, this is Giovanna Moreno on behalf of petitioner and cross-respondent Cervecera de Puerto Rico. There are two key issues before this court. One of them relates to the board's inappropriate rewriting of an article of the applicable CBA, and the other one to the board's conclusion that an impasse is not valid because of post-impasse conduct, which is not the applicable standard according to this court's own precedents. We request this court to reverse the board's decision determining that Cervecera violated the National Labor Relations Act. Said decision has overreaching consequences that transcend this case. The decision holds that the board can ignore contractual agreements and that the impasse doctrine will never apply. And if you allow me to go straight to the union leave issue. First of all, there's no doubt that the board interpreted the CBA and that therefore at the novel standard of review based on ordinary principles of contract law applies. This court has recognized that when the parties agree to contractual provisions that limit their rights with regards to a term or condition of employment, the court will give effect to the plain meaning of the provision. But so the plain meaning of Article 34 seems to be that the union president has to request prolonged leave. How do we understand those? Yes, well, the request, it's our position that the article has to be interpreted in combination or complimentary to the company policies. And there's an attendance policy and there's evidence on the record that shows that set request refers to the employee's duty to submit the form that is attached to that attendance policy. So even though the word request is there, there's a specific definition for that procedure. And it's clear from the evidence. In this case, the employee, there's evidence, there's also evidence that the board in an independent case determined that if the employee failed to comply with the submission of the form, the managers had the authority to submit the form on behalf of the employee, which is actually what happened here. And it not only happened with the prolonged leave, it happened with the sporadic leave as well. The union president has a history of uncompliance with this attendance form. Could the company have fired the union president for failure to comply with the policy? Like, would that have been consistent with the CBA? Yes, and that would have been the appropriate measure because there was a final warning that was given to the employee a couple of months before the activation of the leave. So the company preferred to just comply with the, abide to the terms of the CBA instead of terminating the employee, which will have definitely been the right, they had the right to do so. How does their prior practice play into all of this? That if you weren't requiring this request for leave, you know, when you're going beyond the 200 days with respect to your negotiating and that that had been kind of, you know, the course of dealing, if you will, how does that fit into what you are saying essentially is mandatory contractual? Well, if we analyze the prior practice with respect to the employee's conduct, the prior practice reflects that the company had the authority to submit the form on behalf of the employee, right? So it's our position that the fact that there was no request form which actually submitted by the employee does not imply that the company had no authority to do so. And with respect to the board's position that there was a past practice, you know, that because the prior year, which is a fact, the union president also exceeded the 200-hour caps and hours of sporadic leave cap and the union prolonged leave was not activated. It is our position that just one year does not establish a past practice, right? And there's evidence on the record because there's a table with the list of all the union officials. But is there any evidence in the record that that had ever not been the practice? Well, the evidence on the record does not reflect that it was actually the practice. And it's our position, our respectful position that it was a general counsel's burden to prove that there was actually a past practice. We're talking about 30 years of industrial relationship and they only presented evidence of an exception of one year. And the other evidence on the record shows that any other, there was no other instance whatsoever on which any other employee had exceeded the sporadic leave cap, okay? Let's take a situation where you're beyond the 200 days and you're still negotiating and the union and the employer is still participating in those negotiations. And so then there's kind of that practice where there's not been a requirement for the leave form because you're still negotiating, you're not at the impasse and nobody's saying anything about going beyond the extended days. Is that fair to then cut off this practice with the leave? Well, the 200 hour caps did not apply to negotiations. Yeah, okay. It did not apply to negotiations. So it doesn't, you know, those absences were excluded from the sporadic 200, yeah. So, and it's very important for us, you know, context is very important, right? When we interpret a contract, we have to go to the party's intention and that's part of the basic principles of contract law. And it has been recognized by this court that when doing the de novo review and going to whatever facts, factual determinations the board made, the analysis is based on the party's intention. And the reason for the party's negotiation of those leaves was that unlike most union organizations, all the officials, okay, all the board members of the union in this case are active employees. So the parties recognized that there was a need of a balance, okay? And that they had to identify a way of protecting the time to be used in union matters, but also protect the efficiency of the operation. So Ms. Mario, even if that is the case, and we think that's the way article 34 should be understood, was it reasonable for the company to not check with Luciano about whether he wanted to take those additional days as sick leave or vacation days? Or, I mean, maybe they weren't, maybe the company wasn't required to do that, but would it have been reasonable to? Well, and if so, would that be some evidence of animus by the company? Well, on the contrary, I think that terminating Luciano will have been definitely animus against him and the company preferred not to do so. So my answer will be that the company's way of, managing the situation was in benefit of Luciano and that there was no need to actually ask him because he was fully aware of his union leave use and because it was agreed, it was negotiated and agreed. The article does not contemplate that whenever you reach the 200 hours, we have to sit down and analyze whatever you are gonna do. The article is pretty clear. It says once the 200 hour cap is exceeded, yes. So in the company's view, there was no adverse employment action because he could have been terminated and instead of being terminated, he was placed on prolonged leave. And not only that, how would you say that complying with the terms of the CBA is an adverse employment action? That will be contrary to the National Labor Relations Act. I mean, it's- How about the testimony from the HR person who said it was a disciplinary action? Agnes Escalera? No, she did not say, with all respect, she did not testify that this was a disciplinary action. She actually reiterated that the leave was never imposed and that the company was only adhering to the strict language of the CBA. That she said that he had a previous warning dated August 2021 and that he was warned that any subsequent violations with the company's policies will entail a termination. That's what she said. But this was not an adverse employment action and there's no testimony as to that. There's no evidence on the record as to that. That was just the board's interpretation, incorrect interpretation. And what do you argue is the status quo? The status quo was the CBA. A past practice and there's case law, and I can gladly submit the authorities through a 20-AJ letter, but I found case law, it's not in the briefs, that expressly says that past practice cannot alter the clear language of a contract. So our position is that whatever the board analyzed with that prior year, that it's not by definition of past practice because it was just one year exception, cannot even be considered because there's a specific language, contracted language that was the status quo. And what about Tim? Do you find- Go ahead, Judge Rogers. Did you find authority from this court? Regarding the impact of past practice? In response to Judge Child's question, you said- No, no. I don't know any cases from this circuit. No, I did not find cases- Not know all of them. No, Your Honor, I did not find cases from this circuit. I did find from the Seventh Circuit. Thank you. So, and if we can go to the impasse, case, well, it's our position that there were, there's no doubt that the article that was being negotiated, Article 27, was critical, vital to both parties. That's actually a determination. And basically the board held that because the parties engaged in different negotiations and several articles were executed after the declaration of impasse, then there's no impasse, right? But it's our position that Colmatt, which is the board's president, recognizes that after the declaration of a single-issue impasse, the parties can definitely have negotiation sessions. And this court already had, you know, ruled upon this and had a similar situation in a case named Aerie Manufacturing in which the court said that what had to be analyzed was that if there was any evidence on the record that the union actually had a new, and this court said new proposal regarding the article on which the impasse was declared. In this case, there was none. There was no further negotiations regarding Article 27. And in fact, there were, you know, we cannot deny that there were movements after the declaration of impasse, but the standard that this court recognized in Laurel is that what is important is the pre-impasse conduct and not the post-impasse conduct. Ms. Moreno, the company is not arguing that there was an overall impasse, only that there was a single-issue impasse in the article. That's correct. That's correct. Oh, is that consistent with the record? It is consistent with the record. The record shows that after the declaration of impasse, there was no further movement. Well, the union- Counsel, the record shows that there were several articles on which agreement had not been reached. So I want to know why you view this as a single-issue impasse. Oh, because there were still articles that were not in their final, you know, best and final offer. They were pending. And that's precisely the factual situation in Erie. The union said, or the general counsel said, there cannot be a valid impasse because there's a lot of different articles that we have not even started negotiations on. And that doesn't matter. Started negotiations. What's your citation for Erie? I'm looking at your brief. It's Erie Manufacturing. In my notes, I only have the year, which is 2012. You read Brush? Yes, that's correct. What is the citation? If you allow me. No, did Judge Rao, she found the citation? I think that the name of the case is Erie Brush and Manufacturing. Yes, that's it. Thank you. I'm not sure I have the site. Is that a case from this circuit or the Seventh Circuit? It is from this circuit. Yes, it is. All right. And how do you spell the first word, Erie? It's E-R-I-E. Thank you. You're very welcome. So our position is that as explained and since the board departed not only from the applicable legal standards from this court and from their own- Excuse me. I don't see that case cited in your brief. Have I missed it? It's, I think it's in my reply brief. Ah. I'm sorry for the... Oh, counsel, that's all right. I can look it up after oral argument. I just wanted to be clear whether it was in your opening brief. It's 700, I found the citation. It's 700 Federal Third 17 from year 2012. Thank you. You're very welcome. So I was just, you know, reiterating our request that this court reverse the sentence and reverse the board's decision because it's our position that it not only departed from the applicable precedent, it departed from the applicable case law from this court and it failed to provide reasonable explanations for that departure from its precedent. And it also ignored the evidence on the record as a whole. Okay, thank you. I'll give you a couple minutes in rebuttal.  Good morning, your honors. May it please the court, Barbara Sheehy for the National Labor Relations Board. I'm gonna make a couple of points under both of the topics that you were just discussing with my friend across the aisle. I'll start with the contract issue. So a couple of things first. I'm gonna start with the standard of review. The board's position is that it's not a de novo standard here because it's not purely contract interpretation. If you follow the board's analysis, what they did was first they find that there's a past practice that is inconsistent with the terms of the contract. So it's not purely looking at what does the contract say? There is also the element of, is there substantial evidence in the record to show that the parties weren't engaged in a particular kind of practice? So I think it does a disservice to say that this is purely a de novo standard of review. If you were to disagree with that past practice, which the board found based on one year, then would it be de novo review of Article 34? I still don't think so. But I wanna say, I don't wanna agree fully with that question, because I don't think it's fair to characterize the board's finding based on a single year. I think what you need, I think what the court needs to look at is it was a series of events over the course of two years. Luciano didn't become union president until January of 2019. They were in the contract started in September, 2018. There isn't another, there's not another contract in the record. So I do not know if this is carry over language. So we have the 2018 to 2021 contract that was extended into 2022. Luciano comes on board in January, 2019. And then there's nothing in the record that he, how many hours he used. There are no timesheets. Then we know in 2020, beginning in April, or sorry, the 20, this is the 2020 to 21 timeframe. In April, April 23rd of 2021, he gets a letter from Escalera saying, you've hit 192 hours. Please verify and confirm your hours and send us any corrections. Then on May 4, he gets a follow up saying, we made a mistake. You're actually at 200 hours. We forgot to include March 17th. If you need more time, you ought to request it. You should request it. August 5, he, this is still all in that contract. This is a series of events showing repeated, repeated instances by this employer of accepting his leave requests. Okay, but the fact that an employer sort of by grace gives someone more time doesn't necessarily mean they've changed the terms of the contract. I mean, what about the Cecil case from 2002 from this circuit, which is almost directly on all fours? I'll be honest. I'm not familiar with that case. I don't, if it's in the, I don't, is it in the briefs? It is not in the briefs, but it is a law of the circuit. Sorry, I'm not, I'm not familiar with that case. I'm happy to submit something later that wasn't drawn to my attention. I didn't find that case. It's not been argued that that was inconsistent. Well, it's, I mean, it's a case in which an employer had one year where they gave, you know, a certain amount of time and then the following year refused to give that time. The board said, oh, the employer changed its practice and our circuit said, no, it didn't, you know, and getting away with, I think Judge Williams uses the term lavish leave in one year doesn't mean that an employer has changed the terms of the contract. I mean, respectfully, again, I don't know the facts of that case, but I'm going to, I think, I think I'm gonna argue even without knowing the facts of that case, but if there was a single one-off in that case, that is very different from an employer from April, 2021 till April, 2022, continuing not to take action against somebody. So whether he has lavish leave, I think is sort of, that's sort of beside the point. How were they treating his requests for additional leave? And the answer to that is inconsistent with the contract, whether it was out of benevolence or they didn't want to manage, I don't know. If an employer doesn't enforce the terms of a CBA in a way that is detrimental to an employee, are they then always going to be bound by those terms? Because that seems to be the position of the board and that strikes me as quite remarkable. Absolutely not. This contract was in a post-expiration period. They could know, you can't, so you have to maintain the status quo. The status quo was read then in the context of both the contract and the party's practice. They could have, during these contract negotiations, submitted a change to the article. You are not bound by that. You can submit- Why should they submit a change to it? It's still in effect. If they're not happy, but your honor was suggesting that there was no recourse for this employer. And I'm suggesting that to bring the practice- They have a CBA, why should they, I mean, I don't really understand the board's position here. I mean, if there's a CBA in place, why can't an employer enforce those terms? Because the law says otherwise. The law says that if you have a collective bargaining agreement provision and you enforce that, that's fine. If they had continued a consistent practice, we could fight about whether the contract entitled them to the reading that they have, but let's suppose they didn't change what they were doing. That's one thing, but you can't, it's not fair to employees or to either party to have a contract provision, but a practice completely inconsistent with that. And then all of a sudden saying, we're gonna go back to something we've never done before. You have to, because the employee starts to rely on that or parties start to rely on that. So the issue with that is, you can bring it in line with the contract, but you have to do it the right way. You can't immediately put somebody on six months leave without pay and say, well, because we could have fired you, this wasn't all that bad. This guy went without pay for six months. I don't think that's a trivial matter. And I don't think, I think I find it disrespectful, in fact, that the company could suggest that because they could have fired him, that they were actually treating him in a positive way. It's disrespectful. It is the, I mean, the board has to find that there was animus by the employer. They did, they relied on three different factors. They relied on the timing. I know that, but to say that's disrespectful, I mean. No, I'm sorry. The suggestion that it wasn't any big deal. We could have fired him and all we did was take and suspend him for six months. I think that is a disrespectful position. And I think it trivializes. I think it's- I think the trial is going to the fact of, you have plenty of employment law out there that says, we don't have to like our employees. We just can't do things that are illegal. And so saying disrespectful, we want to get to the legality of- Oh, sure, very good. And I'm not, the board doesn't talk about this. I'm saying the suggestion in the brief, the Cavalier suggestion in the brief, that this wasn't any big deal because we didn't fire him. I don't, I think that that is not a wise, anyway, I'm only speaking to that. But no, it is, what they did is illegal under board law. The point is not necessarily about whether it's Cavalier. The point is like, if they could have taken a more severe action under the CBA, i.e. terminate him for failing repeatedly to comply with the attendance policy, then the action that they did take was much less than termination. So that is arguably some evidence of lack of animus. Or maybe it's not an adverse employment action at all. I think with respect to the question about whether there's animus, we put this, this is in the brief, that just because you take a lesser action than what you could have done, sort of in the same vein as, I didn't weed out all the union adherents, I only fired two or three of them, doesn't negate that you can still act with animus even if you didn't bring down the hammer fully. It doesn't mean that just because you did something that was lesser than what you could have done, it doesn't negate the animus. And there's a series of cases that speak to sort of in a comparison standpoint in terms of, like I said, weeding out union adherence. Just because you didn't fire everybody doesn't mean that you still didn't engage in animus. At some point made the, or maybe it was the ALJ made the point that the employer was saying one of the problems here was the ALJ and the board were relying only on two years. And the response, as I recall by the board, was the employer never indicated any contrary contact in any other years by it. So it's not that the employer has the burden as distinct from the burden of the general counsel to the board, but it's not a situation where the board was unaware of the position that was being taken by the agency. And yet even now we don't have any argument much less proffer that things were done differently or I think counsel referred to the 32 years the company has been in operation. I think that's an accurate representation of what the board, of the evidence in this case. Yes, that there is no evidence and there's testimony saying we've never done this before. We've never imposed the leave before. And then again, we have a series of events from starting in April, 2021 of acquiescence on the part of the employer not to put somebody on leave as soon as they hit the 200 hours. He exceeded his leave in 2021 by 28 hours with their approval. Then even in December when he was- As far as this case is concerned, there is nothing in the record about the employer's practice for 32 years or let me limit it to the years that the contract vision that we're talking about article 27 was in effect. The only evidence in the record relates to this contract which is a 28 start September 5th, I believe a 2018. I don't believe there's a prior CBA in the record. Not that I'm aware of at least. So I don't know if this is a rollover- In your analyst argument, you're taking what the board said in terms of no prior notice, no opportunity to bargain on this that it came shortly after the president had negotiated this settlement without the board being involved in any way. And what else do you view as strong evidence of animus? So the three parts of the board rely on the timing which your honor just identified, the past practice, the departure from past practice which we've talked about. And then the third aspect of it is the background conduct, prior conduct, tending to show animus. And the board in that instance relies on the employer's testimony during the hearing that in the summer of 2021, I get some of my dates mixed up, but it's July of 2021, the employer, which is what led to the settlement agreement, the employer unilaterally changed the work hours of the workers. And it's the testimony of the management officials that the board relies on there. They acknowledge that there's an effective collective bargaining agreement. They acknowledge that the hours of work in that collective bargaining agreement were unilaterally changed. So while that was, but those events then were looked at as background information or background evidence of further animus. So it's those three, it's the timing, past practice and the other conduct, the prior conduct in the summer of 2021 in this case. On the impasse question, the circuit has a number of precedents that say, if one party, which is usually the union disagrees to whether there's an impasse that is not dispositive, like Mike sells potato chips. So I'm not sure how the boards, I mean, the board seems, and I've seen this in a number of cases over the last couple of years, seems to be trying to push the envelope on that question. And basically concluding that if one party disagrees with an impasse, there's no impasse. And how would that principle be consistent with our case law? So I don't, in this case, I don't think that that's what the board did. Whether the board is going that way, I don't wanna speak to what the board's doing, but I'm saying in this case, I don't think it is simply the union saying, we don't think we're at impasse. And the administrative law judge does a nice job, I think, in laying out what happened. So it wasn't just the union saying, we don't think we're at impasse, we stand ready to bargain. The administrative law judge lays out what happened. At August 18th, for instance, they were still bargaining. The party signed two more articles. They signed Article 7, Article 26. The employer then also continues to bargain. So this isn't just the union continuing. But that just goes to whether there is an impasse on the contract as a whole, which the company's not even arguing, right? The fact that they're still negotiating on the other articles doesn't mean there wasn't a single issue. No, I'm sorry, I think under CalMet, it does. CalMet has three prongs, and you have to satisfy all three. The second, the board doesn't take issue with. The second is that the issue over which they went to impasse on, so the work schedules, was critical. That's not on the table. The first one is, though, that you have to have a good faith impasse as to the specific article that you implemented. The board finds, in this case, you didn't have a good faith impasse. We could talk about what that is in a second. But the third prong, which I think is what your question is getting at, is that you also have to show as the employer, you have to do all three. So not failing to show one is fatal. The third one that you have to do is show that the impasse over the article that you unilaterally implemented led to an overall breakdown in negotiations, the entire negotiations, and that there was no aspect. You can't interpret the third prong of CalMet to swallow the fact that there can be a single issue impasse. However you interpret that third prong, it can't be basically the third prong is to have a single issue impasse, you must have an overall impasse. I mean, that can't, and that does seem to be what the board is doing here. So I don't, I disagree on this one, whether the other cases are sort of suggesting that I don't know. But I think on this one, the idea that there was no aspect over which the parties could have made progress is belied by both parties here, both the union and the employer. The union, I'm sorry, the employer still is trying to bargain over sick leave and vacation time, linking those two articles, saying if you give us this one, we'll do this one. The union counters and says, if you give us article 17, Christmas bonus, we'll do holidays, article 19. I may have those flipped. But they started linking and they start countering. And then there are additional articles that get signed. That's fine. That just means there's not an overall impasse. None of that evidence seems to go to whether negotiating on some of those matters could have unlocked the impasse on the work schedules on article 27. So it does seem to me that reasoning, you're mentioning all the other articles on which they were negotiating seems to suggest you can't have a single issue impasse if you're making progress on any of the other provisions. And that's to basically say you can never have a single issue impasse. And that is not the law of the board or it hasn't been in the past and it's not the law of the circuit. And that's not, the board didn't change CalNet. It relies on that in this case. I understand it's not explicitly changing it, but the reasoning of it seems to run in a direction that would undermine the possibility of ever having a single issue impasse. And respectfully, I don't, respectfully, I think the board properly applied prong three here to show under its case law that if there is progress to be made on other articles that you cannot have a single issue impasse then. What is a single issue impasse then? Then you're just saying a single issue impasse is a complete impasse. That's exactly what you're saying. If you're making progress on any other articles, you can't have a single issue impasse. For instance, in CalNet, they found a single issue impasse. In that case, they determined that, I think it was, I want to say it was retirement or pension, the issue in that case, or I'll say retirement, but it might've been health insurance, but one of the big ticket items all the time in bargaining. In that case, the board found all three, that the employer had shown all three factors. And that's because whatever the impasse issue was, we'll say retirement, whatever the issue was, I think they used terms in that case, like it was the big shadow over all of the bargaining. And there were statements made at the table that if we can't agree on this, we're never going to come to an agreement. So I think facts matter a lot in these types of cases. Impasse is one of those issues that is uniquely reserved to the, not uniquely, I'm sorry, impasse is one of those issues where the courts routinely recognize the board's expertise on that. And so I think in this particular case, there are facts that distinguish this from CalMet and save the standard as one that the board is continuing to follow. I don't think these facts lend themselves to say the rule is swallowing, or the exception is swallowing the rule, or however that analogy would go. So am I one? No, I'm not going to say that. Unless there are, I'm happy to answer any other questions. I think I- Just generally, how has the board interpreted time periods, you know, with respect to temporal proximity and past practices? I'm just trying to get an idea of when you're looking at the animus argument, you're arguing temporal proximity, but do you know how that's been interpreted just generally? So to be clear, the animus, when the board is looking at motive, and so they're looking at animus, the proximity that they're talking about in that context is, did the action, the adverse act, did the action that happened follow quickly on the heels of some other protected activity? So I think there are cases that say at least a month, I think we put those in our brief, so I don't think there's, I don't understand their argument to say that it wasn't proximate enough. I think what they're, because the settlement agreement was in March of 2022, and that's the relevant event, I think, that the board is saying it happened on heels, and also the collective bargaining, they referenced that, and I think there's a bit of a confusion in the briefs. The charge itself was not the trigger. The charge that eventually led to that settlement agreement, the charge itself does get filed in July, 2021, but that's not the date, that's not the time period the board is looking at. The board is looking at, when did the protected activity happen that we think prompted this action from the employer? And that was happening in March. So I don't know that, the board, I don't think, has a bright line rule. I can say, I think, with pretty confident authority that this court has at least recognized at least one month, and I think even longer than that. But, and so that's sort of the time period that we have here. I feel confident saying that. I'm sure there are cases that go farther than that, farther back, but the one month period, I'm confident. I wanna say maybe Tasty Baking says that, but I couldn't tell you for sure. It would be in our brief. But I don't understand them, or I don't understand the employer's argument to be attacking the proximity, like that these two events were too disconnected in time. They rely on the summer events, which I'm saying is not the appropriate trigger. Unless there are any other questions. Judge Rogers, any other questions? Oh, thank you. Thank you, Judge. Thank you. We asked for full enforcement, obviously. Ms. Moreno, we'll give you two minutes on rebuttal. Yes. I just wanna cover two things. First, the settlement agreement, the July 2021 charge. The board literally adjudicated something that was out of the scope of the charge that was being considered, because it was way previous to the six-month period that the board had to analyze and infer labor practice. And not only that, the board entered into the merits of a case that was not tried. This case was not tried. This was not the matter of this case, right? So there was a violation to the process. There was a violation to the Constitution. There was a violation to the board's precedent. There was a violation to applicable case law. And then even though the judge recognizes in the decision that it was her understanding that an unfair labor practice occurred, the board, the general counsel presented a post hoc rationalization saying, no, no, no, we were just considering the facts behind it. But it's not true. That's not what the ALJ or the board said. They literally considered the merits of a July 2021 charge that was subsequently settled between the parties in March, 2020. And we cannot ignore the fact that that settlement benefited the company. And regarding the- Who was the counsel? I don't know where you get that law, all right? That during negotiations, the parties can't withdraw and settle something among themselves without the board. There was a settlement before the board. There was a non-board settlement. I understand, but it was not a settlement that the board imposed upon the parties. No, no, it was agreed by the parties. I don't know of any case that says, as you say, it's illegal for the parties to proceed as they did here, at least as to the settlement you're talking about. Oh, no, no, I'm sorry. Be careful here, all right? Probably I misstated. I didn't want to say that. I completely agree with the settlement process. I think it was valid. What I'm saying is that the board entered and adjudicated the merits of a charge that was subsequently settled, and that was inappropriate, and that was a violation to the process. That was what I meant. Sorry if I misstated. And the other aspect I wanted to cover is that the case Beacon Journal-POPCO versus Akron Newspaper, 114 Federal 3rd, 596 from the Sixth Circuit says, past practice or custom should not be used to interpret or give meaning to a provision or clause of the CBA that is clear and unambiguous, and that was what I was making reference earlier in my argument. So it's our position that the past practice does not apply here, and if we want to think about what happened between April 21 and April 2022, which the period to which sister counsel made reference to, the only past practice on the record is that the union president failed to comply with the applicable attendance policy and that it was the company who applied or submitted their requests on his behalf, which is exactly what was done with the prolonged leave. Thank you. I think I have your argument. Ms. Sheehy and, well, for both counsel, I'd be interested if you could address this case that I raised, Sasol, which the site for that is 275 F 3rd, 1106. Maybe just a short 28-J letter would be helpful. I read that back to you, which I wrote down. Yes. 275 F 3rd, 1106. Yes. Okay, thank you very much. The case is submitted.
judges: Rao; Childs; Rogers